IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-01998-MSK-KMT

JOANNA MARTIN,

        Plaintiff,

v.

SEARS, ROEBUCK AND CO.,

        Defendant.

_____

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT
AND MOTIONS TO SEAL**

_____

**THIS MATTER** comes before the Court pursuant to Defendant Sears, Roebuck & Co.'s

("Sears") Motion for Summary Judgment **(# 33)**, Plaintiff Joanna Martin's response **(# 39)**, and

Sears' reply **(# 44)**; and several unopposed motions by the parties **(# 34, 40, 45)** to seal portions

of each of their summary judgment filings.

## FACTS

The following facts are undisputed, or, where in dispute, are taken in the light most

favorable to Ms. Martin.

Ms. Martin worked for Sears as a Sales Associate in the Appliances Department at a store

in Aurora, Colorado.  In the Fall of 2006, Michael Daniels became her supervisor.  She contends

that "on every occasion that I did see him at work," he would initiate a sexually-themed

conversation with her.  The record reflects some ambivalent testimony by Ms. Martin regarding

1

her reaction to these conversations, but overall, the record indicates that she did not always find these conversations offensive or unwelcome.  She testified that "every time that he would talk to me about things that involved sex, if it was a joke or something like that . . . I was annoyed, but, I mean, if it was a joke or something like that, I wasn't as annoyed but if it was directed towards me, I was pretty annoyed."  On another occasion, she testified "as far as the sexual talk around work, we just basically – I mean, I let it roll off because I didn't consider it as offensive . . . it's just words."  She testified that she was unable to recall details about many of the conversations, explaining that "if I were more, like, offended or traumatized by it, I would remember word for word, but [I don't]."  Similarly, Ms. Martin noted that Mr. Daniels sometimes "comment [about her body parts], or try to compliment me, but nothing that I was, like, Oh, my gosh, like – I felt like I wasn't in the way of harm.  I was okay."  Eventually, Ms. Martin was directly asked whether she was "offended and traumatized by Mr. Daniel's comments," and she responded "it was customary around work, that's the culture and tone that he had set, and we were all used to it." She acknowledged that, prior to the events discussed below, she never complained to management about Mr. Daniel's conduct because "I didn't really feel like I had anything to complain about."[1]

On February 28, 2007, Mr. Daniels asked Ms. Martin how things were going with her boyfriend, and she informed Mr. Daniels that they had broken up.  They had a further conversation about this subject, and Ms. Martin added that "Oh well, I'm just not going to get laid anymore  ... I'll get over it."  Both Ms. Martin and Mr. Daniels laughed at this comment.

---

[1]On another occasion, Ms. Martin testified "I felt like it was just conversation, felt like it was harmless, I'd be okay . . . I just let it roll off."

Mr. Daniels continued the conversation, asking Ms. Martin if she and her sister would ever have "a threesome" and whether Ms. Martin would "have a threesome" with he and his wife. Ms. Martin testified that she attempted to deflect the conversation to other matters, but that Mr. Daniels was persistent.  Now annoyed by Mr. Daniels' persistence, Ms. Martin stated, intending to insult him, "God, it's true, married people don't get laid, do they?"[2]

Later that shift, Mr. Daniels asked Ms. Martin to go to the stockroom to "show her" something.  Mr. Daniels walked Ms. Martin to the rear corner of the room, pointed up to the ceiling and remarked "no cameras," then grabbed Ms. Martin around the waist and attempted to kiss her.  Ms. Martin pulled away, remarking "are you kidding me?"  She turned to walk away, but Mr. Daniels grabbed her by the waist and pulled her to him again, this time attempting to touch her breasts.  Ms. Martin again resisted and reminded Mr. Daniels that he was married.  She again turned to leave, but Mr. Daniels grabbed her by her writs, pulled her back again, and shouted at her "What the fuck are you doing to me?"  Realizing Ms. Martin was upset, Mr. Daniels then smiled and announced that he was "just kidding," and let go of her.  Ms. Martin states that she "tried to play it cool" and, to get Mr. Daniels to "stay calm," she "tried to laugh with him." They then walked out of the stockroom.  On the way out, Mr. Daniels pointed to his crotch, implying he had an erection, and remarked to Ms. Martin "Now I have to go out there like this?"  Later, Mr. Daniels approached Ms. Martin at her cash register and whispered "I would have fucked you right there, Joey."

---

[2]In a written statement to Sears recounting this conversation, Ms. Martin stated that, after making the comment about "not getting laid," she "asked him if it was true that sex dwindled when you got married."  He responded "yes," and they both laughed again, and then she asked how long he had been with his wife.

Although the precise sequence of events is not clear from the record before the Court, it appears that Ms. Martin felt unable to work the following day, and at some point thereafter, complained of Mr. Daniels' conduct to Sears management.  On March 3, 2007, Ms. Martin gave a handwritten account of the events at issue to Sherry Kenny, the Store Manager.  Ms. Kenny instructed Ms. Martin to stay home and not come to work pending an investigation into the matter.[3]  She instructed Ms. Martin to call in on Monday, March 5, 2007, for further instructions. Ms. Martin called Ms. Kenny on March 5, and Ms. Kenny advised that she had taken a statement from Mr. Daniels and was in contact with Sears' Human Resources Department about the incident, and that she would contact Ms. Martin again later.

After being contacted again by Ms. Kenny, Ms. Martin returned to work on or about March 7, 2007.[4]  Ms. Martin went to the sales floor and began performing normal duties.  When other co-workers arrived, she inquired whether certain individuals she had identified to Ms. Kenny as witnesses had been interviewed, and learned that they had not.  Ms. Martin then learned that Mr. Daniels had been at work all week, and she got angry because "They send me home and he gets to work."  Later, Ms. Martin saw Mr. Daniels actually working on the sales floor, and became upset – "not angry upset, but let down" – that "they weren't investigating anything I told them."  Ms. Martin went to Ms. Kenny's office and asked what was going on. Ms. Kenny responded that they had contacted Sears' Human Resources Department, and that she

_____

[3]It appears to be undisputed that Ms. Martin continued to be paid during this time away from work.

[4]Ms. Martin testified that she was called on March 9 to return to work, and that she returned on March 10.  However, documentation dated March 7 suggests that Ms. Martin returned on that date.  Ultimately, the precise date of Ms. Martin's return is immaterial, and for purposes of this Order, the Court will deem the events at issue to have occurred on March 7.

4

was instructed that the conversation between Ms. Martin and Mr. Daniels on February 28 was

inappropriate and that Ms. Martin would be issued a disciplinary warning.[5]  Ms. Martin asked

whether Mr. Daniels was still her supervisor, and was told that he was.  She asked Ms. Kenny

"what kind of investigation she was running," and asked what would happen to Mr. Daniels.

Ms. Kenny told her that "it was none of [her] business."  Ms. Martin asked whether Sears was

"going to protect me" from Mr. Daniels, to which Ms. Kenny repeatedly said simply, "I don't

want you to be uncomfortable."  Ms. Martin responded that "if she wasn't going to protect me,

that there were federal laws that would, and I would do whatever I had to do since they weren't

going to do anything for me.  And I told her that this was fucking bullshit."

     The record does not clearly reflect how the meeting ended.  Ms. Martin states that Ms.

Kenny said that "I'll see what I can do, I'll call [the Human Resources Department].  And that's

all she said."  Although she does not identify any particular statements by Ms. Kenny prompting

it, Ms. Martin left the office with the impression "that I had to find another job."  Ms. Martin did

not return to work at Sears.[6]  She remained on the Sears payroll until she was formally

terminated in August 2007, although the extent to which she continued to receive pay or benefits

after March 7 is unclear.

     Ms. Martin commenced this suit, alleging three claims: (i) hostile environment sexual

---

[5]The warning issued to her cites "unprofessional conduct of a sexual nature" as the
grounds.

[6]Several weeks later, apparently after Sears' external Human Resources Department
completed its investigation of the incident, Sears wrote to Ms. Martin, advising her that Mr.
Daniels no longer worked there, inviting her to call Ms. Kenny to discuss returning to Aurora or
transferring to another store, and advising Ms. Martin that "Sears will not be issuing any
disciplinary action to you regarding the incident about which you complained."

harassment in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; (ii) retaliation in violation of

Title VII, arising from the issuance of the disciplinary notice on or about March 7; and (iii) a

separate claim of retaliation, in that Ms. Martin contends that Sears' failure to take more

remedial measures to protect her compelled her to resign, thus amounting to a constructive

discharge.

Sears moves for summary judgment **(# 33)** on all three of Ms. Martin's claims.  With

regard to the sexual harassment claim, Sears alleges that Ms. Martin cannot show that the

incident in the stockroom was subjected to was sufficiently severe and pervasive, nor that the

remaining sexually-themed comments by Mr. Daniels were unwelcome.  With regard to the

retaliation claim premised on the disciplinary notice, Sears contends that the notice does not

constitute an adverse employment action because it did not affect the terms and conditions of

Ms. Martin's employment and, in any event, it was later withdrawn by Sears.  In addition, Sears

contends that Ms. Martin cannot show that the reason proffered by Sears for that disciplinary

notice is pretextual.  With regard to the retaliation claim premised on an alleged constructive

discharge, Sears contends that Ms. Martin cannot show an adverse employment action – that is,

that she cannot demonstrate that she was indeed constructively discharged.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish one or more elements of the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish each challenged element, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish each challenged element, the movant is entitled to judgment as a matter of law on that claim or defense.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B.  Sexual harassment claim**

Although the articulations often differ slightly, a claim for hostile environment sexual harassment under Title VII has five major elements that must be proven by a plaintiff: (i) that she was exposed to workplace conduct that was offensive, ridiculing, or harassing; (ii) that such

conduct was sufficiently severe or pervasive[7] as to alter the terms and conditions of employment; (iii) that such conduct was unwelcome; (iv) that such conduct was because of her sex; and (v) there is some recognized predicate for the employer's liability for the harassment. *See generally Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir. 2001) (relating to severity elements); *Dick v. Phone Directories Co.,* 397 F.3d 1256, 1262-63 (10th Cir. 2005) (relating to "because of sex" element); *Anderson v. Wintco, Inc.*, 314 Fed.Appx. 135, 138 (10th Cir. 2009) (unpublished) (relating to employer liability). Sears challenges Ms. Martin's ability to demonstrate the second and third elements – that the harassment of which she complains was severe and pervasive, and that it was unwelcome.

Sears' argument separates the conduct alleged by Ms. Martin into two categories: sexually-charged statements made by Mr. Daniels in various conversations with Ms. Martin, and the incident in the stockroom. Without necessarily agreeing that it is appropriate to examine each category independently, *see e.g. National Passenger R.R. Co. v. Morgan*, 536 U.S. 101, 115 (2002) (explaining that an actionable pattern of harassment may exist even where individual acts of harassment may not be actionable on their own), the Court accepts that distinction for purposes of analytical clarity.

Turning first to the stockroom incident, Sears argues that a single instance of unwanted physical contact of this nature cannot, as a matter of law, constitute sufficiently severe and pervasive harassment. *Citing Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 169-70 (10th Cir. 1996); *Meriweather v. Caraustar Pkg. Co.*, 326 F.3d 990, 993 (8th Cir, 2003); *Saxton v.*

---

[7]Severity is assessed from both the employee's subjective perspective, as well as from the objective perspective of a reasonable employee in the same circumstances. *Farragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

*American Tel. & Telegraph Co.*, 10 F.3d 526, 528 (7th Cir, 1993).

In determining whether harassing workplace conduct is sufficiently severe or pervasive, the Court considers all of the surrounding circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). The severity standard is intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code'." *Farragher*, 524 U.S. at 788. Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not rise to an actionable level, nor will "the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.*

Here, the incident in the stockroom touches on several of the *Harris* factors. As described by Ms. Martin, the incident had many indicia of being physically threatening, in that Mr. Daniels repeatedly grabbed Ms. Martin to prevent her from leaving, pulled her close to him against her will, and shouted at her. Ms. Martin testified that she subjectively feared for her physical safety from Mr. Daniel during and after the event and there is nothing in the record to suggest that a reasonable employee in Ms. Martin's circumstances would not feel similarly. The incident occurred in a back room, away from the view and aid of coworkers, and such isolation heightens the threatening character of the incident.[8] Moreover, the record reflects that Ms.

---

[8]Indeed, while Mr. Daniels may have intended that the observation that they were out of view of any cameras would loosen Ms. Martin's inhibitions, an employee in Ms. Martin's position might have understood the lack of surveillance to aggravate the isolating and threatening character of Mr. Daniels' actions.

9

Martin was so shaken by the incident that she was unable to work the following day, and was fearful of being in Mr. Daniels' presence when she returned to work on or about March 7.

Sears finds the events presented here to be a close cousin to those in *Creamer*. There, a female truck driver claimed to have been sexually harassed by the actions of a co-worker. Following a bench trial, the trial court found that the plaintiff was in the dispatch office with another co-worker, when Hoff, another driver, entered the office and kissed the plaintiff on the cheek. The trial court further found some unspecified "inappropriate touching by Mr. Hoff" during this incident, but did not elaborate. As the plaintiff walked around the office and Hoff followed – "not necessarily in pursuit" – the plaintiff indicated she felt his conduct was inappropriate. The plaintiff then walked to the adjacent driver's lounge, where several other co-workers were present. The plaintiff again confronted Hoff about him "grabb[ing] her in the dispatch office," and in response, Hoff "lifted [her] by either her waist or by the wrists onto the pool table and pinned her back against the pool table." Several coworkers told Hoff to stop, and he immediately released the plaintiff. 86 F.3d at 169. The trial court found this conduct did not arise to the level of being "severe or pervasive" and granted judgment to the defendant. On appeal, the plaintiff did not challenge the trial court's findings of fact, but argued that the trial court had applied the wrong standard, focusing only on the pervasiveness of the conduct, rather than examining the severity of the single incident. The 10th Circuit disagreed, finding that the trial court had properly considered both pervasiveness and severity, [9] and affirmed. *Id.* at 170.

---

[9]The next paragraph of *Creamer* is curious. Without specifically identifying any other argument made by the plaintiff, the 10th Circuit stated:

> We see no basis for reversing the district court's conclusion the asserted harassment was not <u>pervasive</u>. The only incident

Despite *Creamer*'s superficial similarities to the facts presented here, it offers Sears little support for an argument that Mr. Daniels' conduct was not sufficiently severe.  While both *Creamer* and this case entail a single, temporally-brief incident of unwanted physical contact with the wrist and/or waist of an unwilling employee, the similarities end there.  *Creamer* did not involve an isolated room; rather, the contact took place in full view of several other coworkers. *Creamer*'s somewhat cryptic description of the physical contact does not include attempts by the Hoff to touch the plaintiff's breasts, does not involve Hoff repeatedly restraining the plaintiff despite her refusals and attempts to leave, and makes no mention of Hoff shouting at a captive plaintiff.  Moreover, unlike *Creamer*, the threatening character of the incident here did not end when Ms. Martin left the stockroom.  Despite clearly and repeatedly conveying her unwillingness to become physically involved with Mr. Daniels, Mr. Daniels nevertheless reanimated the threatening nature of the event to Ms. Martin later in the evening, reminding her in a whisper that "I would have fucked you right there."  Under these circumstances, this Court

---

> specifically cited in the complaint was the incident that occurred on April 24, 1991, namely, Ms. Creamer's confrontation with Mr. Hoff, which began in the dispatcher's office and ended on the pool table in the drivers' lounge a few minutes later. This single incident does not, by any means, amount to <u>pervasive</u> sexual harassment. Furthermore, in light of this record and the district court's factual findings, we find no fault with its conclusion none of the events occurring <u>prior to</u> April 24, 1991 [the pool table incident] amounted to <u>pervasive or severe</u> sexual harassment.

*Id.* at 170 (emphasis added).  The Court parses this paragraph carefully.  But for the last sentence, the 10th Circuit appears to be considering only the issue of "pervasiveness" – that is, the frequency, rather than severity, of harassing conduct.  However, the final sentence addresses both the pervasiveness <u>and</u> severity of certain conduct.  The conduct it addresses is unspecified, but it occurred <u>before</u> the date of the pool table incident.  This suggests that the last sentence is not a  comment on the trial court's findings regarding the severity of the pool table incident.

11

finds *Creamer* sufficiently distinguishable to be without significant persuasive value.[10]

Similarly, *Meriweather* is also unpersuasive.  There, as the plaintiff was leaving work, a co-worker "walked up behind [her] and grabbed her buttock .. .  a grab with force, not merely a pinch, but a hold near her upper thigh."  The following day, the same co-worker and another "stopped [the plaintiff] and joked about the incident [and] briefly blocked [her] passage."  326 F.3d at 992.  The 8th Circuit affirmed the trial court's granting of summary judgment to the employer on the plaintiff's sexual harassment claim, agreeing that "the lone grabbing incident and subsequent encounter does not rise to the level of severe or pervasive conduct."  *Id.* at 993.  The facts in *Meriweather* are clearly distinguishable from those presented here for the same reasons discussed above regarding *Creamer* – unlike the circumstances presented here, *Meriweather* involved no isolated area, no repeated detentions of an unwilling plaintiff, no shouting at the captive plaintiff, nor a intimidating whispered reminder of the incident by the alleged harasser after the incident had concluded.

In *Saxton*, another case cited by Sears, the employee and her supervisor went out for drinks after work.  Over the course of the evening, the supervisor "placed his hand on [the plaintiff's] leg above the knee several times and once he rubbed his hand along her upper thigh," and each time, the plaintiff removed the supervisor's hand and told him to stop.  Upon leaving the bar, the supervisor pulled the plaintiff into a doorway "and kissed her for two to three seconds until she pushed him away."  She told him not to do that again, and he agreed.  Three

---

[10]This Court further notes that *Creamer* entailed the 10th Circuit affirming a trial court's findings following a bench trial. This Court does not understand it to stand for the proposition that such conduct could never, as a matter of law, be sufficiently severe and pervasive.  Instead, the affirmance was based upon the circumstances presented in that particular case.

weeks later, they went out to lunch together in the supervisor's car.  He stopped at a park and got

out to take a walk, and the plaintiff went off in another direction for her own walk.  The

supervisor "suddenly 'lurched' at her from behind some bushes as if to grab her," but she

"dashed several feet away in order to avoid him," and chided him for his behavior.  10 F.3d at

526.  The trial court granted summary judgment to the employer on the plaintiff's ensuing sexual

harassment claim,[11] and the 7th Circuit affirmed.  In finding that the recited events did not rise to

the level of severe and pervasive harassment, the court explained:

> Although Richardson's conduct was undoubtedly inappropriate, it
> was not so severe or pervasive as to create an objectively hostile
> work environment. Certainly any employee in Saxton's position
> might have experienced significant discomfort and distress as the
> result of her superior's uninvited and unwelcome advances. At the
> same time, Richardson's offensive behavior was relatively limited,
> presumably because Saxton was forthright and persistent in
> making clear that the advances were unwelcome. And although
> there were two instances of sexual misconduct rather than one, it
> simply did not rise to the level of pervasive harassment as that
> term has been defined by this court.

*Id.* at 534.

Several of the key characteristics present in the stockroom incident but absent from

*Creamer* or *Meriweather* are present to some degree in *Saxton*.  In some respects, the

supervisor's persistence in *Saxton* despite repeated refusals by the plaintiff is similar to Mr.

---

[11]The incidents described above did not prompt immediate action by the plaintiff in
*Saxton*.  Rather, she discussed the issue with friends "and considered reporting it to AT&T, but
decided against making a complaint at that time."  10 F.3d at 529.  More than six months later,
after her working relationship with the co-worker in question deteriorated, she complained to
AT&T about the deterioration of the work relationship and, for the first time, informed AT&T of
the events occurring earlier.  *See e.g. Holmes v. Utah Dept. of Workforce Servs.*, 483 F.3d 1057,
1065 (10th Cir. 2007) (employee's waiting several months to report harassing incident "raises a
question as to the severity of the incident as perceived by the employee").

Daniels' persistence in the stockroom despite Ms. Martin's refusals.  Similarly, the incident in which the supervisor "lurched" at her in a park (and, perhaps, grabbed her in a "doorway" outside of the bar), away from the workplace and away from the protection of co-workers, might be somewhat akin to Mr. Daniels leading Ms. Martin to an isolated stockroom.  But once again, there are significant and important dissimilarities that dissuade the Court from following the lead of *Saxton*.

Most importantly, the character of the events in this case differs from those in *Saxton*. There, the plaintiff voluntarily went socializing, after work and off-premises, with the supervisor, and one might reasonably expect that in such social situations, the line between working and social roles is blurred and conduct that might be inappropriate in a work situation takes on a different character in the context of socializing between friends.  Here, in contrast, the stockroom incident occurred during work hours and on work premises, and Mr. Daniels secured Ms. Martin's presence in the stockroom on the pretense of work-related tasks.  These facts sufficiently alter the context of the incident.

In addition, the events in *Saxton* do not present the same sort of physical dominance allegedly used by Mr. Daniels in the stockroom.  The facts in *Saxton* create the impression of the co-worker making a series of clumsy passes at the plaintiff, and the plaintiff gently and tactfully resisting them.  By contrast, Ms. Martin's version of the stockroom incident paints a picture of Mr. Daniels twice physically preventing Ms. Martin from leaving and, instead, forcing her into close, unwanted physical contact with him.  Ms. Martin's version of events includes Mr. Daniels shouting at her for resisting him, a characterization far removed from and far more intimidating than the bumbling suitor portrayed in *Saxton*.  Finally, but for the cryptic "lurching" incident in

14

the park, an incident whose character is difficult to meaningfully appreciate, *Saxton* does not involve acts similar to Mr. Daniels' disturbing, whispered coda to the stockroom incident – a coda apparently intended to remind Ms. Martin of his physical intentions toward her, notwithstanding her resistance.  Thus, although one might match *Saxton* on superficial points of comparison to the events at issue here, *Saxton* lacks the ominous overtones of forcible restraint, dominance, and potential violence that are present in Ms. Martin's version of events in this case. Thus, the Court finds *Saxton* unpersuasive.

Ultimately, these and the other cases cited by Sears point to the difficulty in attempting to adjudicate the severity of sexual harassment in a summary judgment context.  Because the question presented is one that turns heavily on context and circumstance, comparison to other cases involving similar-but-not-identical factual scenarios is helpful only in a broad sense.  The cases cited by Sears provide some indication that minor instances of unwanted physical contact forced on one worker by another does not automatically become actionable as sexual harassment, but beyond that general observation, those cases simply fail to fully address and evaluate conduct equivalent to the most troubling aspects of Ms. Martin's tale – isolation, repeated restraint, the threat of violence, and the post-incident reminder of Mr. Daniels' intentions. *Compare e.g. Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (single incident in which customer made sexually suggestive comments to waitress, grabbed her by her hair, grabbed her breast, and placed his mouth on her breast presented an issue of fact requiring trial on issue of severity).

This Court is guided by the fundamental principle that harassment becomes actionably severe when it serves to alter the terms and conditions of employment; thus, the key inquiry is

whether Mr. Daniels' conduct in the stockroom objectively and subjectively interfered with Ms. Martin's ability to continue to do her job. *Turnbull*, 255 F.3d at 1243. The record reflects that Ms. Martin was rendered fearful and intimidated by the stockroom incident, that she was unable to work the following day, and that she was upset when she learned that she would have to continue to work in Mr. Daniels' vicinity (and, perhaps, under his continued supervision). This is enough to show that, subjectively, the stockroom incident interfered with her ability to work. Moreover, the Court has little doubt that a reasonable employee, induced to a remote location by her supervisor and then repeatedly forcibly restrained and required to submit to attempts at sexual touching, shouted at, and, despite having made clear her wishes, later further humiliated by the supervisor reminding her of his intentions, would also find that the nature of the workplace had suddenly and tangibly changed for the worse. Under these circumstances, the Court cannot say that the stockroom incident could never be considered sufficiently severe to support a sexual harassment claim. That question is properly left to a jury.

Because Ms. Martin's sexual harassment claim will proceed to a jury on the strength of the stockroom incident alone, the Court need not resolve the question of whether Mr. Daniels' verbal comments to Ms. Martin are sufficient, of themselves or in concert with the stockroom incident, to be actionable. Accordingly, Sears' Motion for Summary Judgment directed at the sexual harassment claim is denied.

### C. Retaliatory discipline

Ms. Martin alleges that the decision by Sears to discipline her following her complaint of harassment constitutes impermissible retaliation. To prove a claim for prohibited retaliation under Title VII, an employee must first make a *prima facie* showing that: (i) she engaged in

protected activity; (ii) she was subjected to adverse action by the employer; and (iii) there is some causal connection between the protected activity and the adverse action. The burden then shifts to the employer to articulate a non-retaliatory reason for the adverse action, and the employee bears the final burden of showing that the employer's proffered reason is a pretext for retaliation. *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009). Sears argues that the disciplinary notice issued to Ms. Martin does not rise to the level of an adverse action, and furthermore, that she cannot show Sears' proffered reason for the discipline to be pretextual.

Ms. Martin's Complaint **(# 1)** alleges that this retaliation claim is predicated on Sears "informing Martin that she was receiving a written disciplinary memorandum from Sears" on March 7, 2007.[12] The notice at issue states that it is a "final warning" (juxtaposed against a simple, presumably non-final "warning"), and threatens "termination" as the "consequences if associate fails to improve performance." The Court assumes – although the record is not particularly clear on this point[13] – that the notice was issued to Ms. Martin as a result of her own admission to having made sexually-charged statements ("not getting laid anymore"; inquiring about the frequency of sex after marriage) during her conversation with Mr. Daniels on February 28.

---

[12]Ms. Martin's summary judgment response appears to broaden the reach of this claim, arguing that her being sent home with pay pending the investigation also constitutes retaliatory discipline. Sears' reply brief does not object to Ms. Martin's expansion of this claim in this manner. Nevertheless, because the Court finds that a retaliation claim predicated solely on the disciplinary notice could proceed to trial, it need not address whether any other acts of alleged discipline also support this claim.

[13]Ms. Kenny testified that she was instructed to issue the disciplinary notice by Sears' Human Resources Department. The record does not appear to contain testimony from the person who gave that instruction, much less an explanation for that decision.

17

Turning first to the question of whether the notice is an adverse action, an action is adverse for purposes of a retaliation claim if it is the kind of action that would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington, Northern & Santa Fe RR v. White*, 548 U.S. 53, 68 (2006). The standard is an objective one, and does not consider the effect of the discipline on the plaintiff employee; rather, it examines the effect such an action would have on a reasonable employee in the same circumstances.[14] *Id.* The goal of the adverse action analysis is to screen out those cases where the alleged retaliatory act is a "trivial harm" or "petty slight[ ], minor annoyance[ ], and a simple lack of good manners." *Id.* at 68.

A number of 10th Circuit decisions have found that although disciplinary notices can constitute adverse employment actions, a single notice that chastises an employee for some particular action and threatens increased discipline in the future, without more, does not rise to the level of an adverse action sufficient to support a retaliation claim. *See e.g. Medina v. Income Support Div.,* 413 F.3d 1131, 1137 (10th Cir. 2005) (explaining that a reprimand "will only constitute an adverse employment action if it . . . affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities" and finding that warning letter issued to employee for making baseless allegations of workplace harassment did not rise to that level); *Tapia v. City of Albuquerque,* 170 Fed.Appx. 529, 535 (10th Cir. 2006) ("The fact that the letter indicates that Tapia could be disciplined for a future threat is not enough to make the letter itself disciplinary

---

[14]*Burlington* makes clear that consideration of whether the action is sufficiently adverse does <u>not</u> include consideration of the underlying discriminatory acts that led to the complaint that thereafter prompted the retaliation. 548 U.S. at 69.

action"); *Dick*, 397 F.3d at 1270; *Rennard v. Woodworker's Supply, Inc.*, 101 Fed.Appx. 296, 307 (10th Cir. 2004) (unpublished) ("notwithstanding that each reprimand brought employee closer to termination, absent evidence of any immediate consequence of the reprimands, such as ineligibility for job benefits," issuance of disciplinary notices not sufficiently adverse). However, all of these cases predate the Supreme Court's ruling in *Burlington*, which was intended to broaden the definition of adverse action beyond the fairly narrow gloss that prior cases had given it.  548 U.S. at 60.  As a result, one must question whether the narrower conception of the rule embodied in these cases continues to survive.  *EEOC v. PVNF, LLC,* 487 F.3d 790, 803 n. 8 (10th Cir. 2007) ("We note that it is not clear that the warning notice is a materially adverse action in the context of a retaliation claim. Although we recently held that '[a] written warning may be an adverse employment action only if it effects a significant change in the plaintiff's employment status,' we have not had occasion to revisit this holding in light of the Supreme Court's decision).

It appears to this Court that, post-*Burlington*, a disciplinary notice of the type received by Ms. Martin here could be considered an adverse action sufficient to support a retaliation claim. The purpose of a disciplinary notice is to advise an employee that certain conduct was prohibited and to warn the employee against engaging in similar conduct in the future.  Considering *Burlington*'s juxtaposition of "adverse actions" on one hand, and "trivial harms" and "minor annoyances" on the other, this Court assumes that a disciplinary notice falls into the former category.  One can hardly imagine that the employer issuing the notice intends for the employee to treat it as "trivial" or "petty"; clearly, the employer intends for such notices to be taken seriously and for the affected employee to modify her behavior accordingly.  By definition, a

disciplinary notice is intended to have a deterrent effect on the employee's behavior.

In this case, the disciplinary notice was issued based on statements that Ms. Martin made in the course of lodging her complaint of sexual harassment.  Where a disciplinary notice expressly invokes the fact or contents of an employee's complaint of sexual harassment as the basis for the discipline, it seems only reasonable that an employee receiving such a disciplinary notice would be deterred from making such complaints again.[15]  Accordingly, in a post-*Burlington* world, and on the particular facts presented here, the Court finds that the disciplinary notice issued to Ms. Martin could constitute an adverse employment action sufficient to support a claim for retaliation.[16]

---

[15]Sears could reasonably contend that Ms. Martin was not disciplined for making the sexual harassment complaint, but rather, in the course of making that complaint, for having admitted engaging in inappropriate conduct of her own.  Were there evidence in the record that indicated that Sears' management carefully explained that distinction to Ms. Martin in the course of issuing the discipline, the result here might be different.  A reasonable employee, properly advised, could be expected to understand that her sexual harassment complaint was absolutely protected, but her simultaneous admission to having engaged in independent acts of misconduct warranted discipline.  Such an employee would not likely be deterred from making complaints of sexual harassment in the future, even if it meant facing up to the consequences of her own misconduct in the process, as the reasonable employee would be expected to assume responsibility for her own admitted misconduct.  But the record here, particularly when taken in the light most favorable to Ms. Martin, indicates that the discipline was issued by Ms. Kenny with a minimum of explanation and clarification.  A reasonable employee receiving this disciplinary notice, in the circumstances described by Ms. Martin, might very well misunderstand the precise reason for the discipline and resolve never to make a sexual harassment complaint again.

[16]Sears also argues that because the disciplinary notice was rescinded several weeks later, it cannot constitute an adverse action.  This argument is directly refuted by *Burlington*.  There, the employer argued that although it suspended the employee without pay for several weeks, it later rescinded that suspension and repaid the employee for all the time she lost.  The Supreme Court found that the later rescission of the suspension did not ameliorate the suspension's tendency to deter protected activity.   548 U.S. at 72-73.  While a warning letter issued to Ms. Martin does not carry the same financial adversity that the suspension without pay did to the employee in *Burlington,* that case nevertheless illustrates that even an employment action

Thus, the Court turns to Sears' second argument – that Ms. Martin cannot show that Sears' proffered reason for issuing the notice is pretextual.  Sears' proffered non-retaliatory reason for the disciplinary notice is that Ms. Martin "engaged in sexual conversations with Mr. Daniels on the sales floor."  To show an employer's proffered reason to be pretextual, an employee typically shows that the proffered reason is so incoherent, weak, inconsistent, or contradictory that a reasonable factfinder could conclude the reason unworthy of belief.  *Turner v. Public Service Co.,* 563 F.3d 1136, 1143 (10th Cir. 2009).  One of the most common ways of demonstrating pretext is to show that the employer's justification for the action is inconsistent with the employer's actions in similar situations involving similarly-situated employees. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

Here, Mr. Daniels is a similarly-situated individual with regard to Ms. Martin when it comes to the contents of the February 28 conversation, yet Sears admits that Mr. Daniels was not issued a disciplinary notice for having participated in that exact same conversation.  Thus, Ms. Martin has demonstrated that Sears' proffered justification for her discipline was applied inconsistently, and a reasonable factfinder might infer from that fact that Sears' proffered justification for the discipline issued to Ms. Martin is untrue.[17]  Sears argues that the only reason Mr. Daniels was not similarly disciplined for the February 28 conversation was because he resigned on March 16, 2007, before Sears completed its investigation into the event.  However, a

---

subsequently rescinded can have deterrent effects during its lifetime that can support a claim of retaliation.

[17]At the same time, a reasonable factfinder might also conclude that, because Ms. Martin expressly admitted engaging in inappropriate sexual discussions on the work floor, that discipline was appropriately administered regardless of how Mr. Daniels was treated. Ultimately, this is a matter for a jury to resolve.

reasonable factfinder might find this explanation for the disparity in discipline unconvincing and

unjustified.  That factfinder might conclude that Sears' professed interest in delaying the

imposition of discipline on Mr. Daniels until the investigation was completed is untruthful, as

Ms. Martin's discipline was issued well before the investigation's conclusion.  Alternatively, the

factfinder might conclude that Sears clearly accepted Ms. Martin's own version of the events as

truthful when it immediately issued a disciplinary notice to her, and thus, it should have issued

any discipline that was warranted in light of that version of events – a version of events that

included Mr. Daniels participating in the discussion and laughing at Ms. Martin's sexually-

charged comments.  Thus, the mere fact that Mr. Daniels resigned on March 16 would not

prevent a reasonable factfinder from concluding that the difference in Ms. Martin's and Mr.

Daniels' disciplinary treatment suggests that Sears' proffered non-retaliatory reason for Ms.

Martin's discipline is pretextual.

Accordingly, Sears is not entitled to summary judgment on the retaliatory discipline

claim.

### D.  Retaliatory discharge

Finally, Sears seeks summary judgment on Ms. Martin's claim that she was

constructively discharged as retaliation for having complained of sexual harassment.  As

discussed above, to prove this claim, Ms. Martin must show that she engaged in protected

activity, that she suffered an adverse action, and that there is a causal connection between the

two events.  Sears contends that Ms. Martin cannot show that her departure from employment

was an adverse action because Ms. Martin voluntarily walked off the job and resigned.  Ms.

Martin responds with the contention that the circumstances created by Sears amounted to a

constructive discharge.

A constructive discharge occurs when an employer unlawfully creates "working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009). The standard is an objective one, and thus, the subjective perceptions of the employee and employer are irrelevant. *Id.* Thus, the fact that the employee subjectively considered the workplace stressful and was suffering personal health problems as a result "is not an objective criterion used to determine if a reasonable employee would have been compelled to resign." *Potts v. Davis County*, 551 F.3d 1188, 1195 (10th Cir. 2009). The question to be examined is not whether the employee's resignation resulted from the employer's actions, but whether "the employee had any other reasonable choice but to resign in light of those actions." *Id.* at 1194. Thus, the inquiry is on whether a reasonable person in Ms. Martin's position would have believed herself to have "no other choice but to quit." *Id.*

This is a close call, but the Court is required to resolve factual disputes in favor of Ms. Martin. Carefully parsing Ms. Martin's testimony, it appears that her decision to quit was motivated by several factors: (i) a belief that Sears had completed its investigation without talking to many witnesses identified by Ms. Martin; (ii) a belief that Mr. Daniels would receive no discipline for the incident; (iii) a belief that the discipline issued to her was unfair; and (iv) concern about her own safety, as Mr. Daniels was apparently going to remain her supervisor.

With regard to the first two points – that Sears' investigation had been completed and that Mr. Daniels would not be disciplined – Ms. Martin's testimony reflects that these were conclusions she reached on her own, independent of what she was actually told. She testified

23

that she had asked what punishment would be issued to Mr. Daniels and was told "it was none of my concern." She testified that, with regard to the status of the investigation when she left the store on March 7, "I knew the status for me, and she told me nothing else was my business." When asked directly if she "kn[e]w [on March 7] whether the investigation was still ongoing," Ms. Martin replied, "I didn't," and that she had only "assumed it was all settled and done" when she was called back to the store. Although one might reasonably fault Ms. Kenny for not being more forthcoming about the status of the investigation (*i.e.* for not telling Ms. Martin that it was ongoing), a reasonable employee in Ms. Martin's position would not have drawn any conclusions about the ultimate outcome of the investigation or the discipline to be administered to Mr. Daniels based on Ms. Kenny's deflecting answers. Thus, a reasonable employee assessing her options at this stage would not have given these two factors nearly as much weight as Ms. Martin did.

With regard to the third point – that Ms. Martin felt the discipline issued to her was unfair– the Court notes that the discipline is based on conduct to which Ms. Martin expressly admitted. A reasonable employee in that situation would have acknowledged that her own participation in a sexually-charged workplace discussion was inappropriate and the employee would have accepted the disciplinary consequences for that misconduct, even if she simultaneously expected that similar discipline would be imposed on others as well. (As discussed above, however, that employee would have to accept the notion that she would have no way of knowing what discipline was administered to others, and thus, could not base a decision to quit on a belief that disparate discipline was being handed out.) This factor, as well, would not support a conclusion that Ms. Martin was constructively discharged.

This leaves the final point – Ms. Martin's concern for her safety in having to work in the vicinity of Mr. Daniels and, apparently, continue to be supervised by him.  An employee in this situation could be expected to harbor some apprehension about returning to work with Mr. Daniels in these circumstances.  Ordinarily, the Court would be inclined to conclude that the mere fact that Ms. Martin would continued to work with Mr. Daniels would be insufficient to demonstrate that she had no option but to resign.[18]  Indeed, a reasonable employee in that position could request a broad range of protective measures, including a transfer to a different shift or store, a prohibition against Mr. Daniels requiring Ms. Martin to perform duties that would leave her alone with him, or any other number of possible alternatives to outright resignation.

However, according to Ms. Martin's testimony, she asked Ms. Kenny what measures Sears was prepared to take to protect her against future harassment by Mr. Daniels, and, according to Ms. Martin, Ms. Kenny "she just – they just – she said, I don't want you to be uncomfortable. . . And I asked her what she suggests I do the next time my boss asks me to go to a stockroom with him or the next time we're alone together?  And **all she kept saying to me** was, I don't want you to be uncomfortable."  (Emphasis added.)  Taking this testimony in the light most favorable to Ms. Martin, it would appear that she sought some reassurance from Ms. Kenny that she would be kept safe from Mr. Daniels, but that Ms. Kenny refused to offer

---

[18]To hold, as Ms. Martin suggests, that a constructive discharge would lie in these circumstances would be to suggest that any effort by Sears to correct Mr. Daniels' behavior through discipline would be ineffectual – *i.e.* that Mr. Daniels was so incorrigible that stern discipline by Sears would not prevent him from continuing to harass Ms. Martin.

anything other than a repeated, vague platitude.[19]  Under these circumstances, where it appears

that Ms. Martin sought some indication that Sears was going to take steps to protect her from

another assault by Mr. Daniels and that Sears was unable or unwilling to offer her reassurance on

that point, a reasonable factfinder might conclude that, without some promise of protection, Ms.

Martin's only remaining option was resignation.  Accordingly, the Court denies Sears' request

for summary judgment on the retaliatory discharge claim.

### E.  Motions to Seal

Both sides moved to file their summary judgment papers and many of the supporting

exhibits under seal.  Both parties argue that their unredacted moving papers and certain exhibits,

include material that one or both parties designated as "Confidential" under the parties'

Stipulated Protective Order, because, among other things, they contain "identities of individuals

who were not involved in the internal investigation related to this matter but who are not

parties," and persons "whose privacy interests need not be compromised."

The Supreme Court acknowledged a common-law right of access to judicial records in

*Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978).  This right is premised upon

the recognition that public monitoring of the courts fosters important values such as respect for

the legal system.  *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002).  Judges have a

responsibility to avoid secrecy in court proceedings because "secret court proceedings are

---

[19]Not surprisingly, Ms. Kenny's deposition describes the situation somewhat differently and indicates that Sears offered a number of protections to Ms. Martin.  Nevertheless, on summary judgment, the Court is required to accept Ms. Martin's version of events, and in Ms. Martin's version, **all** Ms. Kenny offered was a meaningless assurance that "I don't want you to be uncomfortable."  If, at trial, the evidence indicates that there was more to this discussion than the perfunctory reference in Ms. Martin's deposition, the Court will entertain a Rule 50 motion by Sears on Ms. Martin's constructive discharge claim.

anathema to a free society." *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996).  There is a presumption that documents essential to the judicial process are to be available to the public, but they may be sealed when the public's right of access is outweighed by interests which favor nondisclosure. *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997).  The presumption is not readily overcome, as it is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter. *Cf. McVeigh*, 119 F.3d at 814.

The parties' Motions to Seal here were filed prior to December 1, 2009, when the Court modified D.C. Colo. L. Civ. R. 7.2, which relates to sealing of filings.  The version of that Rule in effect at the time of the parties' motion required a showing of "compelling reasons" to seal. However, effective December 1, 2009, the Court has adopted a more detailed Local Rule 7.2, which makes explicit many of the considerations the Court previously applied in construing the former Rule.  The revised Rule, among other things, makes clear that "A stipulated protective order or confidentiality agreement executed by the parties, standing alone, will not suffice for sealing a paper . . . and will not be binding on the court." D.C. Colo. L. Civ. R. 7.2(B); *see also Johnstown Feed & Seed, Inc. v. Continental Western Ins. Co.*, 2009 WL 866828 (D. Colo. Mar. 26, 2009) (finding parties' stipulated protective order and unilateral designations of confidentiality insufficient to warrant sealing under prior version of Local Rule 7.2.  Simply put, parties are not free, through their own mutual agreement to a designation of "confidential," to limit the public's strong interest in access to judicial records.

Moreover, the Court is unconvinced that vague invocations of the privacy rights of nonparties is sufficient to permit the sealing of records in this case.  Only a handful of the items

sought to be sealed make any reference whatsoever to non-parties to this case, and the few items that make reference to non-party witnesses contain nothing that invokes a privacy interest in these non-party witnesses that is comparable to the strong public interest in access to judicial records.  In some instances, the third-party witness is alleged to have been subjected to acts of sexual harassment by Mr. Daniels; in other instances, the alleged "privacy interest" of the witness appears to be nothing more than a desire not to be mentioned by name.  Although the Court can appreciate the parties' desire to avoid dragging other unwilling Sears employees into a dispute, much less a dispute involving allegations of sexual harassment, the public interest in access to judicial records does not evaporate simply because a case includes factual allegations involving non-parties.  Various rules of evidence and civil procedure are designed to ensure that the privacy rights of non-parties are not trammeled unnecessarily, but to the extent that information about a non-party witness becomes relevant to a dispute, the law readily recognizes that, in all but the most sensitive circumstances, the non-party's privacy interest is subordinate to the public interest in transparent judicial proceedings.[20]  (Moreover, the Court has some doubt that the parties herein have standing to vicariously invoke the privacy interests of non-parties in requesting sealing of documents).  Here, the Court sees no third-party privacy interests of the level that warrant the sealing of any document filed in this case.

Accordingly, the parties' Motions to Seal are denied in their entirety.  The Court will direct the Clerk to unseal all documents filed under provision seal.

---

[20]Were the rule otherwise, one would expect that the parties here would seek to close trial proceedings to the public whenever one of the non-party witnesses was called to testify or where that witness was mentioned in testimony by a party.

## CONCLUSION

For the foregoing reasons, Sears' Motion for Summary Judgment (**# 33**) is **DENIED**.

The parties' Motions to Seal (**# 34, 40, 45**) are **DENIED**, and the Clerk of the Court shall

immediately unseal all documents found at Docket # 35, 41, and 46.

Dated this 7th day of December, 2009

**BY THE COURT:**

Marcia S. Krieger
United States District Judge